NOTICE
Decision filed 02/25/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200187-U

NO. 5-20-0187

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| ADAM V., | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 09-D-144 |
| | ) | |
| VICTORIA A.V.W., | ) | Honorable |
| | ) | William J. Thurston, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justice Wharton concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in denying the respondent's requests for recusal of the trial judge where the respondent failed to demonstrate actual prejudice. Also, the court's allocation of parental responsibilities was not against the manifest weight of the evidence. However, we reverse the court's order awarding the petitioner sanctions under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) where the motion requesting sanctions was not filed within 30 days of the final order and under section 508 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/508 (West 2018)) where the court *sua sponte* awarded the petitioner attorney fees as the respondent was given no notice of the possibility of attorney fees being awarded under this section.

¶ 2    This appeal arises from orders allocating sole decision-making authority and the majority of parenting time as to the parties' minor child, A.V., to the petitioner, Adam V. On appeal, the respondent, Victoria W., argues as follows: (1) the trial court abused its discretion in denying her motion for substitution of judge, (2) the court abused its discretion in denying her motion for

1

recusal, (3) the court's allocation of parental decision-making and parenting time was against the manifest weight of the evidence, and (4) the court erred in granting the petitioner's motion for sanctions and ordering her to pay a portion of his attorney fees. For the reasons that follow, we affirm the court's decisions regarding the denial of the respondent's requests for substitution of the trial judge and allocation of parental decision-making and parenting time. However, we reverse the court's order for sanctions.

¶ 3                                    I. BACKGROUND

¶ 4      As a preliminary matter, because this appeal involves an allocation of parental responsibilities, Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018) requires that, except for good cause shown, the appellate court issue its decision within 150 days of the filing of the notice of appeal. Accordingly, the decision in this case was due on November 18, 2020. However, both parties filed motions to extend the time for filing their briefs, the briefing was not completed until December 29, 2021, and the case was placed on the January 13, 2022, docket. Thus, we find good cause for issuing our decision after the 150-day deadline.

¶ 5      The petitioner and the respondent were married on March 19, 2005, in Arizona. One child, A.V., was born to the parties during the marriage, on May 9, 2008. On September 9, 2009, the petitioner filed a petition for dissolution of marriage and a petition seeking parental responsibilities of A.V. On January 19, 2010, the trial court entered an agreed temporary order, in which the parties, *inter alia*, agreed to shared parental responsibilities of then 15-month-old A.V. and granted the petitioner parenting time.

¶ 6      On October 28, 2011, the trial court entered a judgment of dissolution of marriage, which incorporated the parties' marital settlement agreement (MSA) and joint parenting agreement (JPA). In the JPA, the parties agreed to shared parental responsibilities and a parenting time

2

schedule for the petitioner, which included every Wednesday and alternating weekends with extended time in the summer and on holidays.

¶ 7    On March 22, 2012, the respondent filed a petition for modification of the JPA to establish a new parenting time schedule based on her anticipated employment as a special education teacher at the Chicago Autism Academy in Frankfort, Illinois. In the motion, she noted that she was unable to find employment in southern Illinois, and this would allow her to become financially independent from the petitioner, a physician.

¶ 8    On August 21, 2012, the petitioner filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2010)), seeking an order declaring the MSA and JPA void based on fraud. He contended that (1) he originally sought parental responsibilities of A.V. because he was afraid the respondent would move from southern Illinois, (2) he was fraudulently induced into entering into the settlement agreements by the respondent's false assurances that she would remain in the area and by her allowing him midweek parenting time, and (3) she had shown a complete disregard for A.V.'s best interests because the move interfered with his parenting time.

¶ 9    Thereafter, the trial court modified the parenting time schedule so that the parties alternated weeks with A.V. On December 13, 2013, following a trial on the petition for relief from judgment, the court entered an order finding that the respondent fraudulently induced the petitioner into entering into the JPA. Specifically, the court found that the respondent knowingly made false statements of material fact about her intention to remain in the area, and the petitioner reasonably relied on those false statements when he agreed to enter into the JPA after months of negotiations, mediation, and guardian *ad litem* (GAL) intervention. Thus, the court set aside the JPA based on fraud. On appeal, this court affirmed. See *In re Marriage of V.*, 2014 IL App (5th) 140012-U.

3

¶ 10 On June 27, 2014, the respondent filed a motion for a change in the parenting time schedule, contending that the current week-to-week schedule was not in A.V.'s best interests where she was suffering from anxiety, had gained a significant amount of weight, and strongly resisted going to the petitioner's house every other week. On August 21, 2014, the petitioner filed a response wherein he agreed that the current parenting time arrangement was not in A.V.'s best interests.

¶ 11 On August 28, 2014, the trial court entered an order awarding the petitioner temporary sole decision-making authority over A.V. In the order, the court noted that, although they were both good parents who were involved in A.V.'s life, joint decision-making authority was not practical. The court noted that A.V. had extended family on both sides that were involved in her life, had a newborn sibling (S.W.) at the respondent's house, excelled in both schools, and was involved in extracurricular activities. Although there was one incident of alleged physical violence presented by the respondent, the court noted that it was more than five years prior, during the height of their animosity, was an isolated incident, and the record was unclear as to what actually occurred. The court noted that the respondent fraudulently entered into the JPA, which contained language indicating an intent to remain in the area when she had no intention of doing so. She did not inform the petitioner of her impending move until after it was completed. The court found that she acted in complete disregard of A.V.'s best interests by unilaterally terminating the petitioner's midweek visitation, severely limiting his overnight weekend visits, and not offering him additional days for the missed visits.

¶ 12 On December 10, 2014, the trial court entered a temporary parenting time order, giving the respondent alternating weekends and extended time in the summer. On March 7, 2016, an order was entered wherein the parties agreed to a temporary parenting time schedule, the respondent

4

agreed to voluntarily undergo a mental health examination, and the parties agreed that A.V. would attend family counseling focused on making her understand that she could love both parents and enjoy both households.

¶ 13    On May 21, 2016, the respondent was granted an emergency order of protection in the circuit court of Will County on A.V.'s behalf based on allegations that the petitioner was inappropriately touching A.V.  The order granted the respondent the physical care of A.V. and denied the petitioner any parenting time.  The allegations of sexual abuse were based on A.V.'s medical records from May 2016 and a report from Dr. Eli Newberger, a board-certified pediatrician, who had not personally examined A.V. but had reviewed her medical records and some of the depositions taken in this case.

¶ 14    According to the May 2016 records, A.V. reported that the petitioner put cream on "her privates" and rubbed it.  When asked what she meant by her privates, she pointed to her vaginal area and demonstrated by moving her fingers up and down in the area.  She stated that it sometimes hurt, and it made her uncomfortable.  The physical examination revealed that A.V. had redness in the vaginal area, most likely due to incontinence.  The sexual assault nurse examiner noted that it could not be conclusively determined whether A.V. had been sexually abused, but the chronic application of topical cream in association with friction to a sensitive area may have "created this known clinical consequence."

¶ 15    Newberger's affidavit stated that, after reviewing all of the documents provided by the respondent, he concluded that A.V. had been sexually abused by the petitioner under the guise of providing medical treatment.  Newberger believed that the petitioner performed inappropriate medical treatment on A.V., which he mostly prescribed himself, by applying antifungal cream to her genital area and having her perform Kegel exercises by inserting his finger in her vulva and

5

repeatedly instructing her to tighten. Newberger noted that A.V. had reported this to a sexual assault nurse examiner on May 6, and the petitioner, in his February 5, 2016, deposition, described the treatment in detail. Newberger also found that the petitioner deceived other consulting medical professionals by not disclosing information about this treatment to them. Newberger concluded that the severity and the escalation of the abusive acts posed a risk to A.V.'s psychological well-being and required immediate action. He recommended that A.V.'s contact with the petitioner cease.

¶ 16    Thereafter, the petitioner filed an emergency motion to vacate the order of protection, or, alternatively, to transfer the proceedings to Saline County. In the motion, he contended that the respondent falsified her petition by claiming there were no dissolution proceedings between them, and the petition was merely an attempt to circumvent the Saline County court and its previous rulings. The petitioner also denied the abuse allegations. On May 26, 2016, the order of protection was dismissed because, due to the long-existing divorce case, the Saline County court was in a better position to address custody and safety issues with regard to A.V. In the order, the Will County court noted that its review of the GAL's affidavit revealed that similar allegations were made and addressed in the Saline County case, the medical records indicated that A.V. suffered from incontinence issues (not abuse), and the Illinois Department of Children and Family Services (DCFS) had not initiated a safety plan for A.V.

¶ 17    On July 29, 2016, the respondent filed a motion for substitution for cause with the Saline County court. The motion alleged, *inter alia*, that the Saline County court's *ex parte* communication with the petitioner's counsel, and the subsequent *ex parte* communication between the Will County judge and the Saline County judge, were inherently improper and showed bias in

the petitioner's favor. The petitioner filed a response in opposition, and the motion was thereafter denied.

¶ 18    Subsequently, over the course of several days in 2018, a hearing was held to allocate parental decision-making authority and parenting time. Dr. Michael Handwerk, a licensed psychologist, testified that he initially saw A.V. on August 7, 2014, during the petitioner's alternating weekly parenting time. During that session, A.V. indicated that she had a good relationship with the petitioner, did not reveal any concern about being in his care, and did not express any fear of or displeasure with her paternal grandparents. She was guarded when questioned about her life with the respondent. At subsequent visits, she was engaged, happy, and affectionate toward the petitioner. When asked about her adjustment following the change in parenting time, she expressed that she was a little sad about not seeing the respondent as frequently but was doing well.

¶ 19    In May 2015, A.V. indicated that she was having urinary accidents at school, she was having trouble with her school friends, and she missed the respondent. However, she was excited about dance and seeing the respondent for several weeks. She expressed that she wanted to be with the respondent after school and then with the petitioner after he got off work. On September 21, A.V.'s demeanor drastically changed. She expressed that she hated the petitioner and everything about Harrisburg, believed the petitioner was evil and caused her urinary accidents, did not like dance class, and wanted to live with the respondent. She reported that her paternal grandparents yelled at her, and she spent too much time with them. However, Handwerk believed that she was trying to tell a specific story, and her behavior did not match her statements. For instance, he noted that she was sitting on the petitioner's lap before she claimed to hate him.

7

¶ 20   At subsequent sessions, the petitioner reported that A.V. had been physically and verbally aggressive and hostile. Although A.V. claimed that she did not have any friends in Harrisburg because everyone was mean to her, she did not appear distraught. She described an incident in which her paternal grandfather yelled at the respondent, explained that she thought the petitioner was keeping her away from the respondent, and described two past incidents where the petitioner was physically aggressive with the respondent. She also claimed that her house in Frankfort was her home, refused to admit that she lived in Harrisburg, and did not want Handwerk to tell the trial court that she was doing well in Harrisburg. In contrast, her comments about Frankfort were overly positive.

¶ 21   On December 1, A.V. was more herself, was not entirely negative about Harrisburg, and relayed some positive experiences with the petitioner and her paternal grandparents. Although she missed the respondent, and was having issues with her friends, who had called her fat, Handwerk noted that she was not as dramatic. After this session, A.V. was not as negative, was engaging and had positive dialogue with the petitioner, and was less resistant. However, she still claimed that she only experienced urinary accidents at the petitioner's house and denied that Harrisburg was her home. She said she was having fun on the outside but was sad on the inside because she missed the respondent.

¶ 22   In February 2017, A.V.'s behavior again changed significantly, and she reported that the petitioner and his parents—her grandparents—were mean to her and would not let her have access to a cell phone at all times. She claimed that the petitioner told her that the respondent was not always nice, which offended her. In her conflict with the petitioner and her grandparents, she claimed that she was relying on her instincts and sticking up for herself. She discussed an incident

involving the petitioner potentially drinking, falling down, and slurring his words; and another incident where he called her a "little shit."

¶ 23 Based on these sessions, Handwerk believed that A.V.'s change in behavior was the result of external influence. Over time, he noted a dramatic shift where she was overly positive about Frankfort but overly negative about Harrisburg and the petitioner. There was nothing reported that indicated she was in any danger from the petitioner, and she was abnormally preoccupied with what was presented to the trial court.

¶ 24 Julie Kuppart testified that she knew the petitioner and A.V. through church. Her first impression of A.V. was that A.V. was a sweet, happy, loving child with lots of friends. Kuppart was present at some of A.V.'s dance recitals, and it appeared A.V. enjoyed dancing. The petitioner and A.V. had a loving relationship. When A.V. was in second grade, she noticed a change in A.V.'s demeanor where she was not as friendly toward her friends and not as open during discussions at church. Currently, A.V. was back to herself.

¶ 25 Melonie Motsinger, A.V.'s dance teacher for approximately five or six years, testified that A.V. was full of life, excited to dance, a joy to have in class, and affectionate. A.V. had a great relationship with the other students. The petitioner and A.V. had a loving father-daughter relationship. There were periods of time where A.V. was unusually quiet, which seemed to occur after weekends with the respondent.

¶ 26 Alesha Allen, A.V.'s kindergarten teacher, testified that, after A.V. went to first grade, Allen regularly saw her in the school hallway and at school activities. During those encounters, A.V. was affectionate with her. However, at the start of the 2015 school year, A.V.'s behavior drastically changed. A.V. would no longer hug, speak to, or look at her. Later that year, A.V. was more friendly to her.

9

¶ 27    Blaire Hunt, A.V.'s first grade teacher, testified that A.V. was a straight-A student, a good helper and volunteer, very sweet and loving, and had a lot of friends. A.V. was very affectionate and would always give her hugs. The petitioner was involved in class activities and provided supplies and snacks for the classroom. Although the respondent contacted her about A.V. being bullied at school, Hunt characterized it as "normal girl drama." A.V. was not being singled out for mistreatment by her friends and seemed to enjoy her time with them. A.V. had some urinary accidents in class towards the end of the school year, but Hunt explained that was normal for A.V.'s grade. However, she acknowledged that A.V. had not had any accidents in the beginning of the school year. After A.V. went to second grade, Hunt still saw her in the school hallway. Initially, A.V. would wave and say hello, but A.V.'s demeanor changed in the fall when A.V. started ignoring her. Around Christmas, A.V.'s behavior returned to normal.

¶ 28    Laurie Pappenfuss, A.V.'s second grade teacher, testified that, at the beginning of the school year, A.V. appeared happy, was excited to start school, and had a good relationship with her friends. In mid-October, A.V.'s demeanor changed, and she seemed really sad. A.V. told Pappenfuss that she did not have a home because she was not sure who she lived with, and she missed the respondent and S.W.

¶ 29    Alexandra Barton, the school nurse, testified that she first noted A.V.'s urinary incidents in the spring of A.V.'s first-grade year. A.V. frequently came to the nurse's office thinking that she had an accident, but she had not, and her underwear was either dry or sweaty. There were a few times where she did have an accident, but she never had a "full blown" incident. Barton spoke to the petitioner about A.V.'s issues, and he indicated that A.V. was suffering from urinary tract infections and constipation issues. While in the office, A.V. was talkative and happy.

¶ 30    Angela Perkins, A.V.'s current teacher, testified that A.V. was a strong straight-A student, was well behaved and followed the rules, and had great manners. Overall, her relationships with her peers were good, although there was occasional drama on the playground. A.V. was not visibly upset by the drama, and, for the most part, she seemed happy at school. Perkins had conversations with her regarding the petitioner being intoxicated: on two occasions, A.V. indicated that she was talking on the phone with him, and he sounded funny and had been drinking. On another occasion, she said they were at a Halloween party, and he was slurring his words and falling down. A.V. also indicated that the petitioner had called her a "little shit," and, even though he was joking, it hurt her feelings. She claimed that the petitioner had spoken negatively about the respondent, which bothered her. She expressed worry about the petitioner but was not emotional when reporting any of these incidents. Perkins thought it interesting that A.V. related the petitioner sounding funny to him being intoxicated. Perkins spoke to the school principal, and they both determined that A.V. was not in any danger. In her school journal and a letter to Santa, A.V. indicated that one of her greatest wishes was to live with the respondent and her sister. She wrote that one of her favorite things to do was spending time with the respondent, and one of her favorite places to go was the respondent's home.

¶ 31    Amanda Moore testified that her daughter and A.V. were friends and classmates. Approximately two years ago, while at a birthday party, Moore noticed that several girls were playing, and A.V. was distant. When Moore asked A.V. how she was doing, A.V.'s immediate response was that she wanted to live with the respondent and go to her school up north. When Moore tried taking pictures of the children, A.V. immediately frowned and acted like she was not having a good time. Prior to that, A.V. was running around playing with the other children. The

11

petitioner and A.V. had a normal father-daughter relationship, he seemed to really care about her, and they got along really well.

¶ 32    Martin Nicholes, the petitioner's friend for approximately 35 years, testified that his two daughters were also friends with A.V. The petitioner's main focus was making sure that A.V. was taken care of and happy. The petitioner was a good father, was very attentive, and participated in her activities. Nicholes had never seen the petitioner do anything inappropriate in A.V.'s presence. He had seen the petitioner intoxicated before.

¶ 33    Robbie V., the petitioner's mother, and A.V.'s grandmother, testified that, in the summer of 2015, after A.V. spent approximately three weeks with the respondent, Robbie noticed a change in her A.V.'s behavior. Robbie acknowledged that this was the first summer after the parenting time change. A.V. started saying that she did not have any friends in Harrisburg because they were all mean to her and did not want to play with her but then she would also still want to be around them. She said that the petitioner's house was not her house, the petitioner was not her father, and the Harrisburg school was not her school. She claimed that she did not want to dance anymore, even though she always wanted to dance and put on a show.

¶ 34    A.V. claimed that the Frankfort home was her home, the respondent's husband was her father, the petitioner and her paternal grandparents hated her and did not love her, and all of her Harrisburg teachers were evil. She said that the respondent was the only one telling her the truth, and she was supposed to let it out and speak the truth. She told Robbie that the petitioner had taken her away from the respondent. In second grade, A.V. struggled in school for the first time, and it was a battle to get her to do homework. She claimed that, since Harrisburg was not her school, she did not have to make good grades. She started having more urinary accidents at school and would regularly leave class to go to the nurse's office. She used to love taking pictures and

12

videos, but now she either did not want to be in pictures, or she would make them erase any pictures taken of her because she did not want them shown to the judge.

¶ 35    Robbie explained that the parenting time exchanges occurred in Mattoon at the police station, and she usually went with the petitioner. During the drive, A.V. was happy and engaged with them until they got close to Mattoon. Then, she would completely change, become quiet, and look worried. Once there, they were not allowed to help her out of the vehicle or touch her things. Robbie believed that A.V. was afraid of letting the respondent see her having fun with them.

¶ 36    After returning from a visit with the respondent in February 2018, Robbie noticed a positive change in A.V.'s behavior. She was happy to be in Harrisburg, played with her friends, and referred to the Harrisburg house as her house again. Currently, A.V. was doing well overall and in school. Robbie believed that the petitioner would be a better custodial parent because he always tried to work with the respondent and do what was best for A.V., he knew that A.V. loved the respondent, and he never tried to turn A.V. against the respondent. She had never observed the petitioner do anything that was adverse to A.V.'s mental or physical health.

¶ 37    Mike V., the petitioner's father, testified that the respondent made the parenting time exchanges difficult. Mike explained that the petitioner would be walking with A.V. towards the petitioner's vehicle when the respondent would call her back for one more hug, and then she would pull A.V. back inside the house. There were also times when A.V. went back inside herself. Once A.V. was in the house, the respondent would come back outside and tell them that A.V. did not want to go with them. They would then have to wait until A.V. was ready to go. In the vehicle, she was quiet and apprehensive until they could redirect her. This continued at nearly every exchange until the petitioner finally started picking her up and leaving. Mike noticed a change in A.V.'s behavior at the end of summer in 2015. She was always friendly, sweet, and social but that

13

changed after she returned from extended parenting time with the respondent. She started saying she did not like Harrisburg, and the petitioner was mean and was keeping her from the respondent. She also said that Mike and his wife were mean and should stop acting like her parents.

¶ 38    On September 20, 2015, Mike went to the parenting time exchange with the petitioner because he knew there was going to be a problem and wanted to record it. During the exchange, he observed A.V. get out of the respondent's vehicle with her suitcase, drop it on the ground, and say that she did not want to go. She became extremely upset and refused to get in the petitioner's vehicle. At that time, Mike was across the road recording the incident. The petitioner then went inside the police station to get an officer to help with the exchange. As they were putting A.V. in the car, the respondent was yelling at the petitioner and telling the officer that the petitioner had abused her for six years and was also abusing A.V. A.V. was inconsolable when she got into the vehicle, yelling that she hated everyone, she wanted to stay with the respondent, and only the respondent told her the truth.

¶ 39    Subsequently, A.V. had another meltdown where she was crying and inconsolable because Mike would not give her a cell phone so she could call the respondent. During the incident, A.V. kicked at her grandmother, swung at her, and tried to grab the phone from her. Mike restrained A.V. by wrapping his arms around her and held her in a loose hold while wrapping his legs around hers so that she could not kick. When A.V. said that he was holding too tightly, he let her go, and she grabbed a tray and swung it at him. They eventually called the petitioner, and he came over and was able to calm her down. Shortly after that, there was another incident where she was upset and angry and hit Mike in the eye with a heavy toy. When she saw the blood, she apologized and was contrite.

14

¶ 40    Mike did not believe that the respondent attempted to foster a good relationship between A.V. and the petitioner. He noted a correlation between A.V. talking to the respondent and her outbursts. He believed that A.V. was torn between wanting to play with her friends and participate in activities in Harrisburg and feeling like she was not supposed to. The petitioner attempted to foster a good relationship between the respondent and A.V., and Mike never heard the petitioner speak derogatively about the respondent in front of A.V. or talk about the court proceedings in front of her.

¶ 41    The petitioner testified about an incident where the respondent claimed he hit her with his vehicle. He explained that the respondent was prolonging the parenting time exchange by leaning inside his car and refusing to shut the door, so he decided to slowly pull forward, even though she was standing by the open door. After going forward, he then slowly backed up. He knew that the respondent was standing there but explained that it was time to leave, and A.V. was extremely upset. He denied abusing the respondent while they were married and denied being physically aggressive.

¶ 42    In 2016, there was a DCFS report made against the petitioner based on the sexual abuse allegations. After an investigation, DCFS concluded that the allegations were unfounded. He denied abusing A.V. and explained that the antifungal cream was necessary because she was suffering from burning irritation and pain in the genital area. He attempted to let her apply the cream herself, but she would not get the cream in the right area. There were times when he applied the cream to her clitoral area while she was in the frog-legged position. He received an email from the respondent saying that, when speaking to A.V.'s psychologist, A.V. brought up the subject of him applying the cream to her genital area, and the psychologist stated that this was not developmentally appropriate at A.V.'s age. However, he did not believe that A.V. was

15

uncomfortable with him applying the cream. He did not tell A.V.'s urologist or physical therapist about applying the cream. A.V.'s physical therapist recommended the Kegel exercises, he followed the instructions that he was given, and he provided those instructions to the respondent. However, he acknowledged that the physical therapist testified at her deposition that she did not remember telling him to put his hands on A.V. while doing the exercises and that A.V. was capable of doing them herself.

¶ 43 The petitioner's main concern during the divorce proceedings was that the respondent would leave the area with A.V. The fact that he was initially given midweek parenting time alleviated that concern. Shortly after entering into the JPA, the respondent approached him about her decision to move up north. However, she later indicated that she had changed her mind. One day, about 30 minutes after he picked A.V. up for his parenting time, the respondent emailed him saying that she and A.V. were moving. After she moved, it was difficult for him to get parenting time with A.V. because of the distance. For weekend visits, he drove to Frankfort on Saturday, he and A.V. spent the night in a Chicago hotel, and he returned her on Sunday. He was unable to exercise his midweek parenting time.

¶ 44 The petitioner testified about times when he would attempt to pick up A.V., but she would not be ready to leave. Sometimes it was two hours before she was ready. The respondent prolonged the exchanges by calling A.V. back for another hug and then would take her back inside the house. Initially, A.V. would be excited to see him, but then the respondent would make a comment to her, and she would get upset. He brought his parents with him so there would be no false allegations made or any misunderstandings about what occurred. He also requested that the exchanges occur at a police station.

16

¶ 45     In the summer of 2015, the petitioner noticed a change in A.V.'s behavior where she was aloof and not as open with him.  Handwerk had told him that she had started saying he was mean, and Harrisburg was not her home.  He testified about a phone call that he had with A.V. while she was on vacation with the respondent.  He claimed that he did not know where she was, so he asked A.V., but the respondent got on the phone and yelled at him about badgering A.V.  He denied yelling at A.V. and interrogating her.  He also testified about an incident where he received a doctor bill for A.V., but he had not been informed that she was taken to the doctor; so, when he talked to her on the phone, he asked if she was sick.  She would not answer the question, and he denied badgering her about it.  After the September 20, 2015, exchange where the police got involved to facilitate the transfer, A.V. was yelling that everyone was evil, and she hated the petitioner and hoped he died.  Some of her behavior during the exchange was exaggerated, such as throwing her suitcase down, but she was notably upset after she got into his car.  This was the first time that A.V. behaved this way, and the respondent did nothing to facilitate the exchange.

¶ 46     After that day, A.V.'s behavior dramatically changed.  She became forceful with him and his parents, constantly made comments about them being evil, and denied that Harrisburg was her home.  However, he did not believe that A.V. hated Harrisburg or thought that everyone there was evil.  There were times where she forgot that she was supposed to be distraught and would laugh but then catch herself and say that she did not mean to laugh.  She also withdrew from her friends, claiming they were bullying her and were never really her friends.  She expressed no interest in activities.

¶ 47     When A.V. was on the phone with the respondent, she refused to get off at the required time.  If the petitioner told her to get off the phone, she would tell the respondent that he was coming at her, and she was scared.  There were times where he had to take the phone from her, but

17

he denied chasing her. He decided to reduce her phone calls to the respondent from twice daily to one per day and also withheld the respondent's parenting time for a bit. Although the respondent denied that A.V. had urinary accidents in her home, A.V. previously said she had accidents while there. It was damaging for A.V.'s health for the respondent to deny A.V.'s urinary and constipation issues. There was a time when he believed that A.V. was having urinary accidents on purpose.

¶ 48 The petitioner believed that it was important that he be the primary decision maker because, despite all of the allegations made against him, he still attempted to foster a relationship between A.V. and the respondent. He did not believe that the respondent would do the same if made the primary decision maker. Consequently, he believed that his relationship with A.V. would significantly deteriorate. He denied drinking alcohol around A.V. and denied that he had gotten intoxicated at a party while with A.V. He had one drink and had someone drive him home that night in an abundance of caution. However, he may have told Handwerk that he had been intoxicated that night.

¶ 49 The petitioner had once called A.V. a "little shit" but explained that it was a joke. He denied hiding her phone and preventing her from calling the respondent. However, he had taken away her phone as punishment. He told A.V. that the respondent was recording her and A.V.'s Skype conversations. Although he agreed that A.V. wanted to live with the respondent and her sister, he believed that A.V. was happy at his home. A.V. never complained about the respondent or her stepfather to him, and he agreed that A.V. had a close, loving relationship with the respondent, her sister, and her stepfather.

¶ 50 The petitioner agreed that A.V. had weight issues and had been in the obese category for the previous four years. However, to address the issue, he enrolled her in activities and sports to

18

keep her active, tried to get her to eat healthier, limited her access to the refrigerator, and talked with his parents about the issue because his mother assisted him with grocery shopping and cooking.

¶ 51    Dr. Larry Jones, a family medicine practitioner, testified that the petitioner had been his partner in a medical group, and A.V. was a former patient. In March 2015, A.V. complained about burning during urination and trouble making it to the bathroom. He diagnosed her with constipation, which he believed caused her colon to enlarge, placing pressure on her bladder. On April 7, she had the same complaints and was diagnosed with constipation and a urinary tract infection. On April 14, the petitioner reported that her urinary symptoms had improved, but she still had occasional episodes of incontinence. On April 30, A.V.'s incontinence issues had worsened after she stopped taking a stool softener. In August, A.V. was diagnosed with a hemorrhagic cystitis, a type of bladder infection that could cause bleeding and a perineal rash. Thereafter, A.V. improved, but she continued to have intermittent accidents, urinary accidents at night, and some daytime incontinence. She was wearing a pantyliner to protect her clothing from the urine.

¶ 52    On September 10, A.V. had redness on her labia majora, which was diagnosed as a yeast infection, and she was prescribed Nystatin cream. Because A.V.'s issues continued, she was referred to a urologist. The urologist believed that A.V.'s bladder was not completely emptying, and that she had urinary stasis, which meant that the urine was being held and was not constantly flowing out of the bladder. He recommended physical therapy for pelvic floor relaxation. On February 18, 2016, A.V. was diagnosed with an anal fissure, a tiny tear right at the opening of the rectum generally caused by constipation.

19

¶ 53    Regarding the antifungal cream, Jones testified that, after the petitioner told him that A.V.'s rash was not improving, he recommended an over-the-counter cream that was stronger than what was prescribed. The cream was safe to use on rashes in the outer genital region, despite the insert warning that it may cause irritation or redness. He believed that it was appropriate for a parent to apply the cream to the child's genital area to make sure that it was properly applied. He did not believe that the petitioner sexually abused A.V., noting that Newberger's affidavit was outlandish and unreasonable. He acknowledged that it was uncommon for a child to have so many urinary tract infections. He also acknowledged that he never had a conversation with A.V. without the petitioner being present. He had seen the petitioner drink socially, but he did not believe the petitioner had a drinking problem.

¶ 54    Dr. George Plamoottil's evidence deposition was submitted to the trial court, in which he stated that he was an emergency room doctor. On August 21, 2015, A.V. was brought to the emergency room for vaginal bleeding. Although there was some redness around the skin, he did not observe any signs of lesions or trauma. He asked A.V. if anyone had touched her in a sexual manner, and she said no. There was no conclusive evidence of sexual trauma.

¶ 55    An evidence deposition of Dr. Jo-An Segui, a pediatrician who had treated A.V. while A.V. was in Frankfort, was also entered into evidence. Segui stated that, on August 22, 2015, A.V. was evaluated for a urinary tract infection and rash. She discovered that A.V. had a slight raw patch on her buttocks likely caused by moistness and improper hygiene, inflammation on the bladder wall that was causing bleeding, and a urinary tract infection. She instructed the respondent to stop using the antifungal cream because she did not believe that A.V. had a fungal rash; she believed it was inflammation and irritation. During the examination, she did not suspect any sexual abuse. In a follow-up call between the respondent and another doctor in the practice, the respondent was

20

told that she should take A.V. for a detailed evaluation if concerned that A.V. was being sexually abused. Segui indicated that the respondent seemed like a concerned parent.

¶ 56    The evidence deposition of Dr. Paul Austin, a pediatric urologist, was entered into evidence. Austin treated A.V.'s incontinence issues and diagnosed her with bladder dysfunction and incomplete emptying of the bladder. He recommended behavioral modification therapy, which included relaxation techniques. He did not recommend Kegel exercises, explaining that they were generally for adult female urinary incontinence, which was usually the result of a laxity of the pelvic floor, while a child's incontinence usually resulted from difficultly relaxing the pelvic floor. The petitioner did not tell him about any antifungal cream being applied to the infected area.

¶ 57    The discovery deposition of Jennylyn Onde, A.V.'s physical therapist, was introduced into evidence. She recommended pelvic floor stabilization exercises and instructed A.V. on how to do those exercises at home. A.V. was able to perform the exercises on her own during their sessions. While doing the exercises, Onde placed one hand on A.V.'s lower abdomen and another hand just slightly to the right of her anus.

¶ 58    The evidence deposition of Dr. Kathy Swafford, a pediatrician who was certified in child abuse pediatrics, was introduced into evidence. In either May or June 2016, she was asked to review A.V.'s DCFS case file and render an opinion as to whether A.V. was being sexually abused. Based on her review of the file, which included interview notes from A.V. and the parties and A.V.'s medical records, she opined that A.V. was caught up in a contentious custody case, and the petitioner had used poor judgment as a medical provider in applying the antifungal cream. However, she disagreed with Newberger's conclusions and did not believe there was evidence of sexual abuse. She noted that none of A.V.'s medical or mental health providers indicated that there was a concern of sexual abuse, and there were medical explanations for A.V.'s complaints.

21

She also believed it significant that A.V. never reported inappropriate touching, even when she had the opportunity to do so. She acknowledged that she never interviewed A.V.

¶ 59    The evidence deposition of Dr. Mirjam Quinn, a licensed clinical psychologist who treated A.V. from August 2013 to June 2014, was entered into evidence. At one session, when A.V. was five years old, A.V. told her that the petitioner was applying diaper cream to her buttocks because she had a rash there. Quinn then talked to her about appropriate touch and how she was getting to an age where she could do those types of things herself. However, A.V. said she was worried that, if she said she wanted to do it herself, the petitioner would assume that the respondent told her to say that. Quinn explained that sometimes children would use her as an intermediary when there were things that they were too uncomfortable to communicate to their parents. Quinn believed that A.V. was mature enough to take care of her own personal care needs. Quinn invited the petitioner to a session, so she could get his perspective, but he never came.

¶ 60    Quinn had no concerns about the respondent's parenting, and she observed that the respondent and A.V. had a close, loving, and positive relationship. In her previous testimony, she recommended that A.V. be returned to the respondent's care because A.V. had a strong bond with the respondent, which was evidenced by A.V. saying that she was afraid she was going to be taken away from the respondent. Quinn opined that a child's primary attachment bond should not be disrupted. Although she acknowledged that she had not seen A.V. since 2014, she felt that she had gotten to know A.V. and the respondent's relationship very well and doubted that it had dramatically changed.

¶ 61    Katherine Rodriguez, the respondent's friend, testified that she observed the respondent's interactions with A.V. and noted they had a loving relationship, had fun and were happy together, and really enjoyed spending time with each other. She never observed the respondent having any

22

obedience issues with A.V. or A.V. having meltdowns or being distraught. She observed A.V. with her sibling, S.W., and noticed that they were amazing sisters, who loved each other and were always together. The respondent's relationship with her husband, Brian, was very loving and understanding, and his relationship with A.V. was loving and natural. Rodriguez never heard the respondent talk negatively about the petitioner or discuss the litigation in front of A.V. The respondent's residence was a beautiful home; it was clean, organized, very child-centered, and had lots of toys.

¶ 62 Angela Marczali, the respondent's friend, testified that she met the respondent at Trinity Lutheran School when their children were in prekindergarten together. The respondent volunteered at the church and was a room mother for S.W.'s class. When working with the children, the respondent was kind and loving, and the children loved her. A.V. was a happy, smart little girl who had a loving relationship with the respondent. The respondent and Brian had a loving, respectful relationship, and A.V.'s relationships with Brian and S.W. were also very loving. When A.V. stayed with the respondent, she visited the school so she could see her friends. They were always happy to see her and include her, and the teachers were loving toward her and welcomed her to class. Marczali had never seen A.V. being disrespectful to the respondent or disobedient.

¶ 63 Dr. Kelly Champion, a clinical forensic psychologist, testified that she conducted an individual assessment of personality and psychopathology on the respondent in February 2016 to evaluate her for mental health issues and personality strengths and weaknesses. She found no evidence of any psychopathology illness, psychiatric illness, or personality disorder; nor did she find any impairment of the respondent's ability to function in social roles, which included intimate relationships, work, and community roles.

¶ 64    Bruce Ehlers, the respondent's stepfather, testified that he had a strong relationship with A.V. and tried to see her several times each year. He and his wife Skyped with A.V. as often as they could. The respondent and A.V. had an incredibly strong relationship. Bruce had never seen her disobey or disrespect the respondent, and he had never seen the respondent speak harshly to her. A.V. and her sister were happy when together and sad when apart. A.V. had excellent relationships with her cousins. When A.V. was 1½ years old, Bruce was present for a difficult parenting time exchange wherein A.V. was upset and crying about leaving. While the respondent was leaning inside the petitioner's vehicle and trying to comfort her, the petitioner backed his vehicle out of the driveway with the door still open, knocking the respondent to the ground.

¶ 65    Phyllis Ehlers, the respondent's mother, testified that she visited the respondent four or five times per year and had a great relationship with A.V. She was present for a drive to a parenting time exchange during which A.V. was initially very quiet. However, A.V. then became very happy when the exchange had to be delayed by one day. A.V. and the respondent had a great relationship, and the respondent was a wonderful mother. She had never seen A.V. be rude or disrespectful to the respondent or express any negative feelings toward the respondent. She had never seen A.V. have a meltdown or have to be restrained. The respondent lived in a comfortable, spacious condominium that was homey, had a nice backyard, and a park within walking distance. A.V. loved her sister, with whom she shared a bedroom, and had a great relationship with her stepfather.

¶ 66    Angela Kirshner, the respondent's sister, testified that she lived approximately two hours north of the respondent and had three children. A.V. and her daughter were about nine months apart in age and were close. A.V. and the respondent were really close and loved each other a lot, the respondent was an amazing mother, and Kirshner never witnessed anything that concerned her about the respondent's parenting. She had never heard the respondent say anything negative to

24

A.V. about the petitioner. However, she had noticed that A.V. did not talk about the petitioner much and got visibly anxious or frustrated when she did talk about him. Last year, her family was visiting the respondent when A.V. had to leave to return to the petitioner's house. A.V. was playing with the rest of the children, but once she was told it was time to leave, her entire demeanor visibly changed, and she became anxious and upset.

¶ 67 Robert Mourad, the respondent's father, testified that the respondent's husband was a very hard worker and an extremely good father. The respondent and her husband had a very good relationship. Mourad visited the respondent several times per year and stayed for approximately one week each time. He tried to visit when A.V. was there. A.V. was the sweetest child, and he never noticed her being disrespectful or rude to the respondent or the respondent's mother. She was always a happy, respectful child with him, and he never observed any disciplinary issues.

¶ 68 During the parties' marriage, when A.V. was approximately one year old, Mourad received a telephone call from the respondent where she indicated that the petitioner was verbally abusing her and had pushed her around; she seemed afraid. When A.V. was approximately three or four, he received another call from the respondent when the parties were having difficulty during a parenting time exchange because A.V. was upset and did not want to go with the petitioner. The respondent told him that A.V. was afraid to go and asked him what to do. In the background, he could hear the petitioner yelling. A.V. was also yelling, saying, "Grandpa, can't you help us? Please help us, grandpa."

¶ 69 Last August, Mourad was present when A.V. talked to the petitioner on the phone. After the conversation, A.V. was upset and said she could not understand what the petitioner was saying. Later, the respondent received a text message from the petitioner that did not make sense, so she called him. Mourad heard the petitioner slurring his words and noted that the petitioner was not

making sense. The next day, during the exchange, A.V. was upset, crying, and did not want to go. After the petitioner left with her, she called the respondent, and he could hear the petitioner and his mother yelling at her to hang up.

¶ 70    Newberger, who was regularly involved in the examination and evaluation of child sexual abuse victims, testified that he was retained as an expert by the respondent. After reviewing the petitioner's deposition and A.V.'s medical records, he noted that A.V. had frequently complained of daily urinary urgency, itching, pain while urinating, anal fissures, blood in her urine, and toileting accidents; and that part of the petitioner's treatment of these issues was to apply an antifungal cream to the genital area. Newberger indicated that this treatment was an unusual practice in that it was an off-label application of a topical antifungal agent that was specifically contraindicated for vaginal application, partly because it caused redness and itching. The package inserts stated that it was not to be applied to the genitals. He found it concerning that, even though A.V. stated that she was uncomfortable with the treatment, the petitioner did not stop. It was also concerning that there was nothing in A.V.'s medical records that indicated the petitioner was instructed to do this; there was no mention of this treatment. A.V.'s issues were particularly concerning because, very frequently, children who were sexually abused suffered psychosomatic effects of anxiety and feeling unsafe, which could manifest in a regression in toilet training. He found it unnecessary and inappropriate that the petitioner placed his hands on A.V.'s mons pubis and underneath her butt to perform Kegel exercises because, generally, a child of A.V.'s age could control those exercises herself, and she was being taught how to do them by a physical therapist. He opined that the petitioner's treatment of A.V. was sexual abuse.

¶ 71    Newberger's findings were used as a basis for the order of protection entered against the petitioner. He also filed a complaint with the medical licensing board, although he acknowledged

26

that no charges came from the investigation. He admitted that he never talked with A.V. or the petitioner, and there was no mention of sexual abuse in A.V.'s medical records from her urologist. His report noted that the petitioner had inserted a finger in A.V.'s vagina, though he could not point to where he saw that in the provided documents. Based on his suggestion, the respondent took A.V. for a forensic interview and a physical examination. A sexual assault nurse examiner noted A.V. had redness to the vaginal area, most likely caused by incontinence but could neither confirm nor deny that sexual abuse occurred. Thereafter, a report was made to DCFS, but a safety plan was never put into place.

¶ 72    Brian W., the respondent's husband, testified that he had a good relationship with A.V., and they liked to draw, do puzzles, and go on nature walks together. A.V. was a sweet girl who was going through a lot, so he tried to help her through it and be positive. He treated A.V. and S.W. the same. While at their house, A.V. never screamed or punched at him, wet the bed, or complained about her genital area itching. A.V. and S.W. played together, creating plays for everyone to watch. The family regularly attended church. He was present for several of the problematic parenting time exchanges and explained that the problems stemmed from A.V. not wanting to go with the petitioner, not from the respondent refusing to let her go. During the exchanges, he found it surprising that the petitioner would not try to calm A.V. down and would instead just stand there. A.V. would be struggling and hysterical, but the petitioner did not seem concerned and was cold and inattentive. Although the petitioner blamed the respondent for A.V.'s behavior, the respondent tried everything to calm A.V. down. He had never heard the respondent say anything about the petitioner to A.V. When A.V. complained about the petitioner, the respondent encouraged her to talk to him about her concerns.

¶ 73     Edward Eytalis, the GAL, testified that the trial court had entered an order that A.V. should go to counseling for the express purpose of conveying to her that she could love both of her parents and be happy in both homes.  However, he subsequently received a letter from the counselor chosen by the respondent that showed the counseling was not in the spirit of the court's order and went beyond the specific purpose.  However, he acknowledged that he never spoke with the counselor to determine whether she tried to adhere to the court's order.  He also acknowledged that, if what A.V. was saying about the petitioner was true, it would be difficult to convince her to have a good relationship with him.

¶ 74     The respondent testified that, while she was married to the petitioner, he consumed alcohol excessively, which caused them a lot of problems.  When intoxicated, the petitioner was belligerent and physically aggressive with her, sometimes when she was holding A.V.  He would stand over her and shout in her face.  One time he screamed in her face while holding up a tape recorder to record her response.  She also testified about a time where he pushed her against a wall, and she fell and landed on her wrist.  There were other times where he had slammed her against a wall.  She claimed that he broke an entire set of dishes by smashing them on the counter.  He called her names and said negative things about her body after having A.V.  After being questioned by the GAL about why she did not file a police report or leave the petitioner earlier, she explained that the petitioner blamed her for his behavior, so she initially thought it was her fault.  Regarding the incident involving the car, the respondent explained that she was attempting to buckle A.V. into the car seat in the petitioner's car, but A.V. was uncontrollable, screaming, and bucking her body, so she was having a difficult time.  While standing inside the door, and before A.V. was buckled in, the petitioner quickly backed up, and the door slammed into her so hard that she fell.  He then drove down the street with the door open and A.V. not completely buckled into the car seat.

28

¶ 75    The respondent noticed that when A.V. was in her care for a period of time, A.V.'s weight would decrease because they had a healthy lifestyle. She did not make A.V. conscious about her weight, but she cooked healthy meals, and the entire family was pretty active, especially in the summer. They went on nightly walks as a family. The only times that A.V. had urinary issues at her house were immediately after returning from the petitioner's care, and A.V. had never wet the bed while at her house. She also never complained of genital rashes or developed urinary tract infections while there. The petitioner's deposition where he described putting the antifungal cream on A.V.'s genital area was upsetting and confirmed what A.V. had told her.

¶ 76    The respondent testified that A.V. stated that the petitioner was forcing her to participate in dance. She did not attend A.V.'s first dance recital because A.V. was upset and anxious about her being around the petitioner. A.V. claimed that she hated her paternal grandparents because they antagonized her, and her grandfather had been physically aggressive towards her. The petitioner and his parents would get in A.V.'s face, antagonize her, and physically intimidate her. A.V. was a nice, calm child that would never be described as aggressive. The respondent did not believe that A.V. deserved to be held down to the point that she could not breathe. While in the respondent's care, A.V. never had altercations with adults that required her to be physically restrained. The respondent never had to do anything physical to get her to behave. The respondent never told A.V. that Harrisburg was not her home, but she believed that A.V. felt that way because of the things that occurred there.

¶ 77    There were times when A.V. was visibly upset after talking with the petitioner on the phone because he was yelling at her and/or questioning her about something. While on the phone with A.V., she had heard the petitioner yelling at and chasing A.V. through the house trying to take the phone away from her. She never contacted DCFS about her concerns because she was afraid that

the petitioner would punish A.V. in retaliation. A.V. previously told her that the petitioner punished her by hiding her phone, even though he knew that A.V. looked forward to talking to the respondent every night. The respondent testified that there was a time in 2015 where the petitioner did not let her see A.V. for 53 days. Although he allowed them some telephone contact, he made A.V. use his phone and sat next to her during the call.

¶ 78 The respondent tried to be a calming presence in A.V.'s life, a safe place for her, and to help her deal with stressful situations. The respondent believed that it would be in A.V.'s best interest for her to become A.V.'s primary custodian because A.V. was having so many issues at the petitioner's house that would be alleviated by the change. The respondent also felt that A.V. would be happier, her time spent with the petitioner would be better, and she would be with her sister, whom she loved more than anyone.

¶ 79 As for the difficulty with the exchanges, the respondent testified that, even though she reassured A.V. about going with the petitioner, A.V. got anxious and extremely upset about leaving. She often hid to keep from going. In January 2014, the respondent sent an email to the petitioner about the difficulties at the exchanges and asked him to attend counseling with them. He did not attend any counseling sessions with them.

¶ 80 Although the trial court conducted an on-the-record interview with A.V., who was then 10 years old, the court found that she was not sufficiently mature to receive correct sensory perceptions, to recollect her impressions, to understand and narrate intelligent answers, and to appreciate the moral duty to tell the truth.

¶ 81 On December 28, 2018, the GAL filed a final report and recommendation, indicating that A.V.'s statements did not reflect the truth as she confused her feelings for the truth. There was no supporting evidence that A.V. was being bullied at her Harrisburg school or that her paternal

grandparents or the petitioner were mean to her. Thus, the GAL agreed with the trial court's decision to not consider her preference. He concluded that the respondent was not willing to facilitate a close and loving relationship between A.V. and the petitioner, and there was substantial evidence that the respondent had actively attempted to sabotage A.V.'s happy life in Harrisburg. He noted that none of A.V.'s medical or mental health doctors suspected sexual abuse, and A.V. never complained about sexual abuse when she had the opportunity to do so. The home lives of both parents were favorable to A.V. as they were both loving, stimulating, and safe. He recommended that the petitioner have parenting time during the school year because the respondent would go to great lengths to discourage the petitioner's relationship with A.V. He recommended that the respondent receive alternating weekend parenting time during the school year and liberal parenting time on school breaks and holidays. He further recommended that the petitioner receive sole decision-making authority.

¶ 82    On February 19, 2019, the respondent filed a motion requesting recusal of the trial judge. The motion alleged, *inter alia*, that the trial court's manner of questioning A.V. during the *in camera* interview revealed such a high degree of favoritism and antagonism as to make a fair judgment impossible. Following a hearing, the court denied the motion.

¶ 83    On April 6, 2020, the trial court entered its final order granting sole parental decision-making authority to the petitioner. In the order, the court noted the following: (1) during parenting time exchanges, unnecessary, overly dramatic episodes occurred outside of the respondent's home; (2) after extended parenting time with the respondent, A.V. returned to the petitioner's house with a startling change in behavior and began making accusations and using language that was completely unacceptable for her age; (3) telephone calls between the respondent and A.V. became unnecessarily emotional, prolonged, and overly dramatic; (4) the respondent's phone calls with

31

A.V. were a recorded, note-taking, fact-finding inquisition by the respondent; and (5) some of the phone calls between the respondent and A.V. showed moments that were not consistent with A.V.'s best interests as A.V. would make baseless accusations and damaging statements against the petitioner, and the respondent failed to correct or admonish her.

¶ 84    As for the statutory best-interest factors, the trial court noted that both parents desired custody, but neither believed that joint decision-making authority was practicable at this time; the court agreed.  The court noted that, although the record was filled with instances where A.V. voiced her desire to live with the respondent and blamed the petitioner for not being able to live with the respondent, the record was also filled with instances where the respondent, through her actions, or her failure to act, had poisoned A.V.'s thought processes as they related to her beliefs about the current allocation of parenting time and decision-making.  The court noted that there was an inability of the parents to work together, and that, during the litigation, the respondent accused the petitioner of committing acts of domestic violence, alcoholism, creating obesity issues with A.V., and sexually abusing A.V.  Because of the respondent's refusal to engage with A.V. when she blamed the petitioner for the court's order regarding parenting time, A.V. was led to believe that the petitioner was doing "mean things" by exercising his parenting time, and this resulted in a breakdown in the relationship between A.V. and the petitioner.

¶ 85    The trial court found that each parent had cared for A.V. during the course of the litigation, they were involved in her life, and they both had a network of family that was likewise involved in her life and assisted in daily caretaking functions.  A.V. had a close relationship with her sister and healthy, happy, and beautiful relationships with her maternal grandparents and her stepfather. The court found that A.V.'s statements that she hated Harrisburg, the petitioner, and the petitioner's parents were suspect and at odds with the testimony about the many instances where

32

she was happy and enjoying her life there. The court noted that A.V. had attended Harrisburg schools for a number of years due to the extended nature of the litigation and was currently enrolled there. She attended church, participated in extracurricular activities, and had a number of friends in her school and neighborhood. Although it was apparent that each parent loved A.V., and provided abundant time, effort, and resources to her, the need for A.V. to have a loving and proper relationship with each side of her family had been severely compromised.

¶ 86　The trial court noted that, in the initial months following the respondent's "unilateral and secretive" move to Frankfort, she took no steps to facilitate parenting time with the petitioner or to give him additional time for the missed visits due to her move. She acted in complete disregard of A.V.'s best interests by unilaterally terminating the petitioner's midweek parenting time, and she only made the petitioner aware of her move after it was completed. The court found the factor relating to the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child was the most concerning factor. The court determined that, over the course of nearly a decade, the respondent engaged in a lengthy, conscious, and deliberate attempt to alienate A.V. from the petitioner and exclude him from A.V.'s life. This course of conduct illustrated the respondent's disregard for the petitioner's paternal rights and A.V.'s best interests as well as demonstrated a clear pattern of disingenuous and damaging behavior that continued up until the last day of trial.

¶ 87　The trial court found that the sexual abuse allegations were dishonest, and the course of action that the respondent took to address any concerns was reprehensible. The court noted that the respondent retained Newberger for a "significant amount of money" and used his affidavit as the basis for her order of protection when he had never met A.V. and had never spoken to the petitioner, the petitioner's family members, or A.V.'s medical providers. The court found that

33

Newberger "cherry-picked" self-serving documents supplied by the respondent as the basis for his opinion. The respondent attempted to bypass the court's order by filing for an order of protection in Will County and allowed A.V. to demonstrate unacceptably rude and obnoxious behavior toward the petitioner without reprimanding her. During litigation, when the respondent was given any degree of control or authority, she demonstrated an inability to act in a manner consistent with A.V.'s best interests and the petitioner's parental rights. The court feared that, if the respondent were given any measure of decision-making authority, she would promptly abuse it and continue her attempts to eliminate the petitioner from A.V.'s life. Thus, the court ordered that the petitioner was awarded the parental decision-making responsibilities with the respondent receiving reasonable parenting time.

¶ 88     After filing a postjudgment motion pursuant to section 2-1203 of the Code (735 ILCS 5/2-1203 (West 2018)) on May 4, 2020, which was denied, the respondent appealed. Subsequently, on July 27, 2020, the trial court entered an amended order granting sole parental decision-making responsibilities to the petitioner and an order establishing a parenting time schedule. The respondent then filed an amended notice of appeal. On August 26, 2020, the petitioner filed a motion for sanctions against the respondent in the trial court, asking the court to sanction the respondent for filing various pleadings in a vexatious attempt to harass and destroy the petitioner, which included making false allegations that he sexually abused A.V.; and for either lying about or failing to include pertinent information on the pleadings filed in Will County in an attempt to get around the court's decisions in this case.

¶ 89     On September 4, 2020, the respondent filed an objection to the motion for sanctions, arguing that there was no evidence that she filed the pleadings in an attempt to harass and destroy the petitioner; the allegations made were made in good faith, were reasonable under the

circumstances as they existed at the time of filing, and were made to protect A.V.'s best interests based on the information that the respondent had at the time; and the petitioner was attempting to penalize her for her lack of success in the trial court.

¶ 90     On September 22, 2020, this court entered an order holding the appeal in abeyance until the resolution of the pending motion for sanctions. On December 31, 2020, the trial court entered an order granting the motion for sanctions. In the order, the court found that the respondent fraudulently made untrue and false statements without reasonable cause in the JPA and her *pro se* petition for emergency order of protection; the respondent engaged in an egregious course of behavior to secure parental decision-making authority and parenting time preferences; and the respondent abused the process of the court, caused unnecessary delay, and tremendously increased the litigation costs. The court found that the respondent's actions were without cause or justification. Thus, the court awarded the petitioner his reasonable attorney fees, costs of litigation, and expenses for the filings related to vacating the JPA and the emergency order of protection. After a July 14, 2021, hearing on the amount of sanctions, on August 20, 2021, the court ordered the respondent to pay the petitioner $141,012.95 in attorney fees. On September 9, 2021, the respondent filed a notice of appeal of the sanction orders.

¶ 91                                    II. ANALYSIS

¶ 92     On appeal, the respondent first contends that the trial court abused its discretion in denying her motion for substitution of the Honorable Judge Thurston for cause because his disqualification was required when he engaged in misleading *ex parte* communication with the Will County judge presiding over the order of protection proceedings. She also contends that the court abused its discretion in denying her motion for recusal of Judge Thurston after his interview with A.V.

35

revealed his clear bias and prejudice against the respondent where he acted as the petitioner's *de facto* advocate instead of a neutral fact finder.

¶ 93                                        A. Substitution of Judge

¶ 94                                    1. *Actual Prejudice Requirement*

¶ 95    A litigant may seek the substitution of a judge through a motion for substitution (1) as of right (735 ILCS 5/2-1001(a)(2) (West 2014)) or (2) for cause (*id*. § 2-1001(a)(3)). *In re Marriage of O'Brien*, 393 Ill. App. 3d 364, 372-73 (2009). Unlike a substitution as of right, which is automatically granted without inquiry into the reasons for the motion, a motion to substitute for cause requires an examination of the bases for the requested substitution. *Id*. The party seeking a substitution for cause must establish, by a preponderance of the evidence, actual prejudice. *Id*. Proving prejudice is a heavy burden and is not to be made lightly. *In re Marriage of Petersen*, 319 Ill. App. 3d 325, 340 (2001). A trial judge is presumed to be impartial, and the burden of overcoming this presumption is on the party claiming prejudice. *Id.* at 339. The party arguing prejudice must present evidence of personal bias stemming from an extrajudicial source and evidence of prejudicial trial conduct. *Id*.

¶ 96                                    2. *Ex Parte Communication*

¶ 97    On July 29, 2016, the respondent filed a motion to substitute Judge Thurston, contending that, on May 26, 2016, the petitioner appeared, with his counsel, in Will County on his emergency motion to vacate the order of protection, and the proceeding occurred without notice to the respondent. At the hearing, the petitioner's counsel told the Will County judge that Judge Thurston was available to talk to the court, so the judge could "get a flavor of previous transcripts by [the respondent] before the court, and her history of having lied to the Court." Following an off-the-record conversation with Judge Thurston, the Will County circuit court vacated the order of

36

protection. During a subsequent proceeding in Will County, the court made further comments about its discussion with Judge Thurston. The court indicated that the allegations made against the petitioner in the emergency motion were addressed in the Saline County proceedings. The court also stated:

> "I will further note for the record that I left the bench and made a phone call to the judge who has had this case, the divorce case, for a very long time in Saline County, and is, *** I don't know if shocked was the right word, because my guess is that this party is just rotating around the same piece, for a very long time in a divorce case that has been going on since '06."

¶ 98 In the motion for substitution, the respondent argued that the *ex parte* communications with the petitioner's counsel for the purpose of obtaining Judge Thurston's cell phone number and arranging for him to talk with the Will County judge, and Judge Thurston's *ex parte* conversation with the Will County judge in which he falsely advised the judge that the abuse issues were already litigated and otherwise advocated for the dismissal of the order of protection, were inherently improper and showed his bias in the petitioner's favor. Thus, the respondent requested that Judge Thurston be substituted for cause in this matter.

¶ 99 On September 1, 2016, the petitioner filed a response to the respondent's motion for substitution, contending that Judge Thurston's communication with the Will County judge was proper because judges may communicate to assist with the adjudication of a case. Attached to the response was the August 29, 2016, affidavit of Tammi Jackson, the petitioner's attorney, stating that she contacted Judge Thurston's office to find out his schedule and whether he would be available to talk to the Will County judge. She spoke with a clerk and explained that there was a hearing on the order of protection in Will County, and she anticipated that Judge Thurston would want to contact the other judge. The clerk gave her Judge Thurston's cell phone number to give to the Will County judge. Jackson never had any *ex parte* communications with Judge Thurston.

37

¶ 100   Also attached to the response was Judge Thurston's August 18, 2016, affidavit in which he indicated that his administrative assistant received a telephone call from the petitioner's attorney's office notifying him of the Will County proceedings.  He gave his cell phone number to his administrative assistant in case the Will County judge wanted to contact him, and he never spoke directly to the petitioner's attorney.  During his conversation with the Will County judge, the following information was exchanged: (1) there was a pending dissolution proceeding between the parties, which had been pending for several years; (2) he expressed surprise that, even though numerous attorneys had been involved in these proceedings for years, the respondent appeared *pro se* to obtain an emergency order of protection on a Saturday morning; (3) he relayed that the parties' divorce case had been the most contentious and bitter case that he had presided over in his career; and (4) after the Will County judge informed him about the allegations in the respondent's petition, he informed the judge that those same allegations had been made in the pending Saline County case.  Judge Thurston stated that, at no time, did he indicate that the abuse issues were already litigated, advocate for dismissal of the order of protection, or communicate his opinion on the pending Will County litigation.  He also indicated that the Will County judge did not seek an opinion from him about the case.

¶ 101   On October 11, 2016, the Honorable Judge Mark Clarke entered an order denying the respondent's motion for substitution of Judge Thurston for cause.  According to the order, First Circuit Rule 7.1 permitted judges to confer regarding child custody proceedings.  Further, any Saline County judge assigned to the case would have been required to confer with the Will County judge because both cases involved actions affecting the same child, and, the mere fact that information about the two cases was disclosed, would not warrant recusal as the exchange of information was necessary to determine whether both cases should continue.  The order also

concluded that the allegations that Judge Thurston intentionally or knowingly gave false information to the Will County judge, or advocated for any particular action, were not supported by the record. Instead, the order concluded that Judge Thurston's involvement was limited to the following: he received a message from his administrative assistant that a judge in another proceeding involving the same child might want to speak with him; he allowed his administrative assistant to give out his phone number for that purpose; the judge contacted him, and he complied with the mandates set out in the supreme court rules and the local rule; and any communication with the petitioner's attorney's office was limited to facilitating a conference between the two judges.

¶ 102 The supreme court rules permit consultations between trial court judges to ensure the coordination of cases. Specifically, Illinois Supreme Court Rule 900(a) (eff. Mar. 8, 2016) provides as follows:

> "Trial courts have a special responsibility in cases involving the care and custody or allocation of parental responsibilities of children. When a child is a ward of the court, the physical and emotional well-being of the child is literally the business of the court. The purpose of this article (Rules 900 *et seq*.) is to expedite cases affecting the custody or allocation of parental responsibilities of a child, *to ensure the coordination of custody or allocation of parental responsibilities matters filed under different statutory Acts*, and to focus child custody or allocation of parental responsibilities proceedings on the best interests of the child, while protecting the rights of other parties to the proceedings." (Emphasis added.)

Also, Illinois Supreme Court Rule 903 (eff. Mar. 8, 2016) states:

> "Whenever possible and appropriate, all child custody and allocation of parental responsibilities proceedings relating to an individual child shall be conducted by a single judge. Each judicial circuit shall adopt a rule or order providing for assignment and coordination of child custody and allocation of parental responsibilities proceedings."

¶ 103 Pursuant to Rule 903, the Illinois First Judicial Circuit adopted a more specific rule dealing with multiple cases involving the same child. Rule 7.1 prescribes that:

39

"As mandated by Supreme Court Rule 903, whenever possible and appropriate all child custody and allocation of parental responsibilities proceedings, as defined in Supreme Court Rule 900, and relating to an individual child, shall be conducted by a single judge. Each judge to whom a child custody and allocation of parental responsibilities proceeding is currently or subsequently assigned upon being apprised of the existence of another child custody and allocation of parental responsibilities proceeding involving custody and allocation of parental responsibilities or visitation and parenting time issues with respect to the subject child, shall confer with any other judge to whom another custody and allocation of parental responsibilities proceeding is assigned." 1st Judicial Cir. Ct. R. 7.1 (Dec. 27, 2006).

¶ 104   Lastly, Illinois Supreme Court Rule 63(A)(5)(b) (eff. Jan. 1, 2016) allows a judge to engage in *ex parte* communications concerning a pending or impending proceeding to consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or consult with other judges.

¶ 105   Here, the respondent's substitution for cause was based on the *ex parte* communication between Judge Thurston and the Will County judge regarding the entry of the emergency order of protection. However, there is nothing in the record that indicates that Judge Thurston went beyond what is permitted in the supreme court rules and the local rule. In his affidavit, Judge Thurston stated that (1) he had no *ex parte* communications with the petitioner's attorney or her office; (2) in his communication with the Will County judge, he never advocated for the dismissal of the order of protection, did not inform the judge that the abuse allegations were already litigated, and did not communicate any opinion on the pending Will County litigation; and (3) his conversation with the Will County judge was limited to informing the judge that there was a pending dissolution proceeding between the parties, and the allegations raised in the petition had been raised in the dissolution proceeding. Therefore, we conclude that the *ex parte* conference between Judge Thurston and the Will County judge was exactly the type of communication contemplated by the rules. Since there was a lengthy dissolution proceeding involving the same minor child pending,

40

Judge Thurston was required to confer with the Will County judge to determine whether it was possible for the proceedings to be conducted by only one judge.

¶ 106   In making this decision, we recognize that, in the Will County case, the petitioner's attorney stated that the Will County judge should speak with Judge Thurston so that Judge Thurston could provide the court with "a flavor of previous transcripts" and the respondent's history of lying.  However, there is no indication in the record that the two judges actually discussed Judge Thurston's previous ruling that the respondent had committed fraud.  Moreover, although the order of protection was not transferred to Saline County, there was nothing preventing the respondent from filing a new petition there.

¶ 107                                  3. *A.V.'s Interview*

¶ 108   The respondent next argues that Judge Thurston revealed his bias and prejudice against the respondent during his interview with A.V.  On August 31, 2018, Judge Thurston conducted an on-the-record interview with A.V., who was 10 years old, to ascertain her wishes.  At the conclusion of the interview, Judge Thurston found that she was not sufficiently mature to receive correct sensory perceptions, to recollect her impressions, to understand and narrate intelligent answers, and to appreciate the moral duty to tell the truth.  On February 19, 2019, the respondent filed a motion for Judge Thurston's recusal based on this interview.  In the motion, the respondent argued that Judge Thurston's conduct demonstrated actual prejudice and bias against the respondent in that his improper questioning and castigation of the 10-year-old child revealed such a high degree of favoritism and antagonism as to make a fair judgment impossible.  At the April 5, 2019, hearing on this motion, the respondent argued that the interview transcript showed that Judge Thurston had an agenda to discredit A.V., his questioning was more like cross-examination and was not

impartial, and he questioned A.V.'s truthfulness and did not allow her to explain some crucial issues.

¶ 109   After the hearing, the Honorable Judge John Sanders denied the respondent's motion, finding that the respondent failed to satisfy her burden of proving actual prejudice, there was no credibility to the respondent's argument that Judge Thurston had an agenda to discredit A.V., and Judge Thurston's questioning did not show that he had some type of hatred toward the respondent or deep-seated favoritism toward the petitioner.  The court indicated that the judge's role in the interview was not to elicit facts of alleged wrongdoing but to determine whether the child could competently express her feelings about parenting time.  Thus, the court found that Judge Thurston acted impartially, and in the best manner he could, to elicit testimony from a 10-year-old child in a very contentious parenting matter spanning more than 9 years and on the thirteenth day of trial.

¶ 110   Section 604.10(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) permits a trial court to interview the child in chambers to ascertain the child's wishes as to the allocation of parental responsibilities.  750 ILCS 5/604.10(a) (West 2018).  During the *in camera* interview, the court has considerable discretion in setting limitations on the subject matter of the inquiry.  *Fohr v. Fohr*, 75 Ill. App. 3d 575, 579 (1979).  Before the court can properly weigh the child's expressed wishes, the court must be satisfied that the child possesses the understanding of her age, intelligence, knowledge, and experience.  *Id*.  Courts must be careful in conducting *in camera* interviews, and in relying on the wishes of the children in determining the allocation of parental responsibilities, because children often lack maturity to indicate their preference, they may feel disloyal toward one parent, and it provides an incentive for parental manipulation of the child and an opportunity for the child's manipulation of the parents.  *In re Marriage of Hefer*, 282 Ill. App.

3d 73, 76-77 (1996). If relying on the child's wishes, the court should be satisfied that the child's wishes are based on factual matters and not merely hopeful thought. *Id.* at 75.

¶ 111   Here, after carefully reviewing the *in camera* interview of A.V., we agree that the respondent has failed to satisfy her burden of showing actual prejudice on the part of Judge Thurston. Although Judge Thurston elicited testimony from A.V. as to whether she understood the difference between telling the truth and a lie and questioned her truthfulness on certain statements, the transcript did not reveal an attempt by him to discredit A.V. in order to ignore her preferences or a deep-seated favoritism toward the petitioner. The fact that another judge might have conducted the interview of the 10-year-old child differently does not mean that Judge Thurston acted with actual prejudice toward the respondent. Judge Thurston's role was not to elicit specific facts of wrongdoing from A.V. but instead to determine, based on the factual matters, whether she had sufficient maturity to competently express her preference regarding parenting time. Judge Thurston had considerable discretion in conducting the *in camera* interview and setting limitations on the subjects discussed. Because the respondent has failed to satisfy her burden of showing actual prejudice, we find that the court did not abuse its discretion in denying her motion for recusal.

¶ 112                    B. Allocation of Parental Responsibilities

¶ 113   The respondent next contends that the trial court's allocations of parental decision-making authority and parenting time were against A.V.'s best interests and against the manifest weight of the evidence.

¶ 114   A trial court's decision with respect to the allocation of parental decision-making and parenting time must be based on the best interests of the minor child. 750 ILCS 5/602.5(a), 602.7(a) (West 2018). The court's decision of what is in the minor child's best interests should

43

not be reversed unless it is against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988). A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007).

¶ 115 Section 602.5(b) of the Act (750 ILCS 5/602.5(b) (West 2018)) permits the trial court to allocate to one or both of the parents the decision-making responsibility for significant issues affecting the child as to education, health, religion, and extracurricular activities. To determine the child's best interests in allocating these responsibilities, the court must consider all relevant factors, including: (1) the child's wishes; (2) the child's adjustment to home, school, and community; (3) the mental and physical health of all individuals involved; (4) the parents' ability to cooperate to make decisions; (5) the level of each parent's participation in past significant decision-making about the child; (6) any prior agreement or course of conduct between the parents regarding decision-making; (7) the parents' wishes; (8) the child's needs; (9) the distance between the parents' residences; (10) whether a restriction on decision-making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage a relationship between the minor child and the other parent; (12) the physical violence or threat of physical violence directed at the child; (13) abuse against the child or other members of the child's household; (14) whether one parent is a sex offender or resides with a sex offender; and (15) any other factor that the court expressly finds to be relevant. *Id.* § 602.5(c).

¶ 116 Section 602.7(a) of the Act allows the trial court to allocate parenting time. *Id*. § 602.7(a). The court must evaluate 17 separate factors to determine the child's best interests with respect to the allocation of parenting time. *Id*. § 602.7(b). The factors are: (1) the parents' wishes; (2) the

44

child's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of the petition; (4) any prior agreement or course of conduct between the parents; (5) the interaction and interrelationship of the child with his or her parents and siblings or any other significant person; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the child's needs; (9) the distance between the parents' residences, the cost of transporting, the families' daily schedules, and the ability of the parents to cooperate; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. *Id*.

¶ 117 Although a trial court must consider all relevant factors when determining the child's best interests, it is not required to make an explicit finding or reference to each factor. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. In general, we presume that a trial court knows the law and follows it accordingly. *Id.*

¶ 118 In this case, the trial court evaluated all of the relevant factors for its decision regarding the allocation of parental decision-making and parenting time. In determining A.V.'s best interests, the court properly considered, among other things, her interactions and interrelationships with both parents, her stepfather, her sister, and her extended family; her adjustments to her school, home, and community; her physical, emotional, and psychological needs; the distance between the two

45

residences; and the willingness of each parent to facilitate and encourage a close relationship between her and the other parent and to place her needs ahead of their own. The court noted that there was some testimony as to physical abuse directed at the respondent but found the petitioner's testimony concerning those incidents credible.

¶ 119    The trial court found that the factor relating to the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child was the most concerning factor. Throughout nearly a decade of litigation, the respondent showed an inability to act in a manner consistent with A.V.'s best interests and the petitioner's parental rights. The respondent consciously and deliberately attempted to alienate A.V. and exclude the petitioner from her life. She also continuously exhibited disingenuous and damaging behavior throughout the entire trial. The court expressed concern that this behavior by the respondent would only continue.

¶ 120    The respondent contends that the trial court's decision was against the manifest weight of the evidence because it ignored A.V.'s wishes; there was credible evidence of the petitioner's inappropriate sexualized behavior toward A.V.; and the evidence revealed that the petitioner had substance abuse issues, A.V.'s weight fluctuations corresponded with which parent she was staying with, and she felt extreme anger towards the petitioner.

¶ 121    Although A.V. expressed her preference to live with the respondent, the trial court is not required to follow her wishes. While a mature child's preference that is based on sound reasoning is given considerable weight, when a child shows a lack of maturity and sound reasoning, the court may find that the child's preference is not in her best interests. *Shoff v. Shoff*, 179 Ill. App. 3d 178, 185 (1989). The court here found that A.V. was not sufficiently mature to receive correct sensory perceptions, to recollect her impressions, to understand and narrate intelligent answers, and to

46

appreciate the moral duty to tell the truth. Based on our review of the court's interview with her, we cannot say that its decision to ignore her wishes was an abuse of discretion. See *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶¶ 14, 24 (a court's determination regarding whether to consider the minor child's wishes is within the sound discretion of the court and will not be reversed absent an abuse of discretion).

¶ 122    As for the sexual abuse allegations, the trial court found that the allegations were dishonest; the course of action that the respondent took to address her concerns was reprehensible; Newberger "cherry-picked" self-serving documents supplied by the respondent as the basis for his opinion; and Newberger formed an opinion without speaking to A.V., the petitioner, or A.V.'s medical providers.    The court heard testimony about the sexual abuse allegations, which included Newberger's testimony; A.V.'s weight fluctuations; the petitioner's alleged substance abuse issues; and the alleged domestic violence.    The court also considered testimony from A.V.'s medical providers that indicated there were medical reasons for her incontinence issues and for the petitioner's treatment of those issues.    The trial court is in the best position to judge the credibility of the witnesses and determine the best interests of the child.    *G.L.*, 2017 IL App (1st) 163171, ¶ 24. Based on the record before us, we cannot say that the trial court's determinations with respect to the allocations of parenting time or decision-making authority were against the manifest weight of the evidence.

¶ 123                                 C. Postjudgment Motion

¶ 124  The respondent contends that the trial court abused its discretion in denying her postjudgment motion filed pursuant to section 2-1203(a) of the Code (735 ILCS 5/2-1203(a) (West 2018)).  On May 4, 2020, the respondent filed a motion asking the court to vacate its final order granting sole parental decision-making authority to the petitioner.  In the motion, the respondent

argued that A.V. was a very mature, competent, intelligent, and thoughtful young lady whose desires and wishes should have been accorded weight, and the petitioner had alcohol and substance abuse issues consistent with the behaviors and concerns reported by A.V. In support of these arguments, the respondent provided excerpts from A.V.'s schoolwork in which she expressed her desire to live with the respondent and her concern about the petitioner's substance abuse issues. The respondent also indicated that, since the trial court entered its order, additional evidence was found in the petitioner's trash that corroborated A.V.'s reports of him being intoxicated and indicated that he had prescription drug abuse issues.

¶ 125   On June 19, 2020, the trial court denied the motion, finding that the respondent failed to satisfy her burden of showing that the evidence was so conclusive that it would probably change the result of the trial. The court also found that the evidence was merely cumulative in that the argued issues had been explored for years in the litigation.

¶ 126   Section 2-1203(a) of the Code allows the trial court, in its discretion, to modify or set aside its judgment within 30 days of its entry. *Id.* In reviewing the trial court's decision not to set aside its judgment, we consider whether the court has abused its discretion, and whether its order provides substantial justice between the parties. *In re Marriage of Sheber*, 121 Ill. App. 3d 328, 334 (1984). To justify setting aside a prior order based on newly discovered evidence, (1) the party seeking to overturn the order must show due diligence in discovering the evidence, (2) the party must show that the evidence could not be produced at the first trial by exercising due diligence, (3) the party must demonstrate that the evidence is so conclusive that it would probably change the trial result, (4) the evidence must be material and relate to the issues, and (5) the evidence cannot be merely cumulative or serve the sole purpose of impeachment. *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 409-10 (2005).

48

¶ 127　In this case, where the issues concerning A.V.'s wishes and the petitioner's alleged substance abuse problems were vigorously litigated over multiple weeks, we cannot say that the trial court abused its discretion in finding that the respondent failed to satisfy her burden of providing new evidence that would likely alter the result of the proceedings. The evidence provided was cumulative, and the issues raised in the motion were fully litigated. None of the additional evidence offered by the respondent would likely change the result of the proceedings. Thus, the court did not abuse its discretion in denying the motion.

¶ 128　　　　　　　　　　　　　　　D. Sanctions

¶ 129　Lastly, the respondent contends that the trial court erred in granting the petitioner's motion for sanctions and ordering her to pay some of his attorney fees because the motion was untimely, a motion for sanctions involving the Will County filing should have been brought in Will County, the JPA is not a writing subject to Rule 137 sanctions, and the court could not order her to pay a portion of the petitioner's attorney fees without notice and considering the financial resources of both parties.

¶ 130　In the petitioner's motion for sanctions, he contended that the trial court found by clear and convincing evidence that the JPA was procured by fraud perpetuated by the respondent. The petition noted that the respondent had her employer draft a letter that falsely indicated information about her employment and then lied about whether the letter was manufactured. The petitioner also argued that the respondent failed to include pertinent information in her Will County petition for order of protection, including the fact that there was pending dissolution proceedings in Saline County. Thus, he requested sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). However, he identified no other rule or statute as a basis for sanctions in the motion.

¶ 131 The trial court granted the petitioner's motion for sanctions on two grounds. First, the court found a violation of Rule 137 where the respondent signed the MSA and the Will County petition for order of protection. Second, the court, *sua sponte*, found that an award of attorney fees was justified under section 508(a)(1), (a)(2), (a)(3), (a)(4), and (b) of the Act (750 ILCS 5/508(a)(1), (a)(2), (a)(3), (a)(4), (b) (West 2020)), because the petitioner had to use the judicial process to enforce his rights.

¶ 132 Rule 137 states as follows with regard to sanctions:

"(a) Signature requirement/certification. Every pleading, motion and other document of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other document and state his address. *** The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee.

(b) Procedure for Alleging Violations of This Rule. All proceedings under this rule shall be brought within the civil action in which the pleading, motion or other document referred to has been filed, and no violation or alleged violation of this rule shall give rise to a separate civil suit, but shall be considered a claim within the same civil action. Motions brought pursuant to this rule must be filed within 30 days of the entry of final judgment, or if a timely post-judgment motion is filed, within 30 days of the ruling on the post-judgment motion." Ill. S. Ct. R. 137(a), (b) (eff. Jan. 1, 2018).

Thus, Rule 137 plainly states that a motion for sanctions must be brought within 30 days of the final judgment, and sanctions can include reasonable attorney fees. The objective of the rule is to provide a speedy and efficient remedy. *Short v. Pye*, 2018 IL App (2d) 160405, ¶ 42.

¶ 133 Here, the petitioner filed a motion for sanctions on August 26, 2020, which requested sanctions pursuant to Rule 137. The petitioner first contended that he be awarded his attorney fees

50

for having to defend the section 2-1401 petition, which sought to vacate the JPA based on fraudulent inducement. The trial court granted the section 2-1401 petition on December 13, 2013. This was a final judgment between the parties, which was immediately appealable under Illinois Supreme Court Rule 304(b)(3) (eff. Mar. 8, 2016) without a special finding. The respondent appealed the order; this court affirmed the trial court's decision on June 13, 2014; and the mandate was issued on July 23, 2014. Our June 13 decision was a final judgment on the merits of the section 2-1401 petition. Under Rule 137(b), the petitioner had 30 days from the final judgment to file his request for sanctions, especially where he was seeking the costs of the appeal. Therefore, the trial court did not have jurisdiction under Rule 137(b) to award attorney fees related to the section 2-1401 petition.

¶ 134 The petitioner also contended that he should be awarded his attorney fees related to the filing of the Will County case involving the order of protection. The emergency petition for order of protection was granted on May 21, 2016, but it was subsequently dismissed on May 26, 2016. The dismissal of the Will County case was a final judgment for purposes of Rule 137(b). Therefore, pursuant to Rule 137(b), the trial court also did not have jurisdiction to award attorney fees related to the Will County proceedings.

¶ 135 The respondent's next argument is that the trial court erred in *sua sponte* awarding attorney fees as sanctions under section 508 of the Act. Specifically, section 508 of the Act provides that:

> "(a) The court from time to time, after *due notice and hearing*, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. *** Awards may be made in connection with the following:
>> (1) The maintenance or defense of any proceeding under this Act.
>> (2) The enforcement or modification of any order or judgment under this Act.
>> (3) The defense of an appeal of any order or judgment under this Act, including the defense of appeals of post-judgment orders.

51

(3.1) The prosecution of any claim on appeal (if the prosecuting party has substantially prevailed).

(4) The maintenance or defense of a petition brought under Section 2-1401 of the Code of Civil Procedure seeking relief from a final order or judgment under this Act. Fees incurred with respect to motions under Section 2-1401 of the Code of Civil Procedure may be granted only to the party who substantially prevails.

\*\*\*

(6) Ancillary litigation incident to, or reasonably connected with, a proceeding under this Act.

\* \* \*

(b) In every proceeding for the enforcement of an order or judgment when the court finds that the failure to *comply with the order or judgment* was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party." (Emphases added.) 750 ILCS 5/508(a), (b) (West 2020).

¶ 136   Thus, prior to the trial court awarding attorney fees under section 508(a) of the Act, the respondent was entitled to due notice and a hearing. However, as previously noted, the petitioner's motion requesting sanctions did not request an award of attorney fees under section 508(a) of the Act. The motion only requested attorney fees under Rule 137. Therefore, because the petitioner did not seek an award of attorney fees under section 508(a) in his motion, and the respondent did not have the requisite due process set out in that section, the court erred in *sua sponte* awarding attorney fees under section 508(a).

¶ 137   The trial court also, *sua sponte*, issued sanctions under section 508(b) of the Act. The purpose of this section is to enforce compliance with an order of the court. The court did not explain its basis for granting an award of attorney fees as it related to the "enforcement of an order or judgment" where the first basis was for the repayment for the section 2-1401 proceedings, which sought to vacate the JPA, and the second basis was for the repayment for defending against the Will County emergency order of protection. Also, the respondent had no notice that the court would, *sua sponte*, enter an award of attorney fees under section 508(b) as there was nothing in the petitioner's motion seeking sanctions for the respondent's failure to comply with a court order.

Therefore, the court also erred in *sua sponte* awarding sanctions under section 508(b). Accordingly, we reverse the court's December 31, 2020, and August 20, 2021, orders awarding the petitioner $141,012.95 in attorney fees.

¶ 138                                                III. CONCLUSION

¶ 139   For the foregoing reasons, the orders of the circuit court of Saline County with respect to the substitution of the trial judge and allocation of parental decision-making and parenting time are affirmed, and the sanction orders are reversed.

¶ 140   Affirmed in part and reversed in part.

¶ 141   JUSTICE CATES, specially concurring:

¶ 142   I concur in the majority's disposition in this case. I write separately because of the trial court's error when it *sua sponte* issued sanctions pursuant to section 508 of the Act. The issuance of these sanctions, although not requested by the petitioner, revealed that the trial court formed an opinion adverse to the respondent, without the benefit of a motion or hearing. Recognizing that this trial judge had previously exercised great restraint and patience, in my view, the playing field was no longer level at the time the sanction order was issued, but tipped in favor of the petitioner. Therefore, I specially concur to suggest that a new trial judge be appointed to hear all further postdissolution proceedings.